Good morning, Your Honors. May it please the Court. My name is Esperanza Anderson. I'm here on behalf of Appellant and Relator Frank Adomitis. And the reason we're here today is that the District Court applied the wrong standard when it was ruling on Defendant's motion to dismiss the third amended complaint. Instead of accepting the allegations in the complaint as true and drawing any reasonable inferences in favor of Relator, the District Court accepted whatever inference Defendant put forward, almost as fact. And then what the District Court did is that it seemed to rule on those facts. It determined which facts it wanted to believe, and it issued a ruling based on that. And we submitted the ruling as well. Did you get to any discovery in this case? No, we did not. No discovery? No. No depositions? No. No, not yet. We're at the very beginning. And I think in order to understand some of the errors, because there were quite a few, it's important to talk briefly about the background of this case. What it is is Relator is alleging fraud in connection with Defendant's admittance into the critical access health program. So what this is, it's a special, limited Medicare program that seeks to encourage hospitals to be operated in rural and remote areas, places where probably there wouldn't be hospitals otherwise. There's not a whole lot going on. And so it does that by paying extra money in order, you know, to reimburse the hospitals for operating in those locations. The hospitals get 101% of their actual costs, which is something that doesn't happen under the regular Medicare program. There are basically two important requirements here, and those are the location requirements. And what it is is it has to be a hospital. So you have to actually have a hospital, 24-hour emergency, et cetera. But it has to be located in a rural area, and it has to be a certain distance from the nearest acute care hospital. So normally that is 35 miles. Or in what's relevant in this case, in the case of mountainous terrain or in areas with only secondary roads available, then that limit is reduced to 15 miles. Now the statute doesn't define... The position is you can't mix and match those. Right. So, you know, does that make any rational sense that you would care if it was secondary for 15 miles the whole way, and you would care if it was mountainous for 15 miles the whole way? But if it's 14 miles mountainous and one secondary, then a different rule should apply. Is there any rational basis for that distinction? Well, that's how the law is written, but I don't think we get there. I don't even think we get there because the definitions... In interpreting a rule, we certainly would look at whether or not it makes any sense at all. And just explain to me why, from any conceivable policy point of view, that would be a rational reading, that you would care about 15 miles of one and 15 miles of the other, but not 14 of one and one of the other. Explain to me why that should make a difference. Well, because the idea is to try and keep the program limited. It isn't to reach every last hospital in the rural area, and that's because it is so very expensive. But more importantly, what we point out in our papers is that we don't get to the mixing and matching because there were no properly designated miles of mountainous terrain. So there was nothing to add to the secondary... Before you go on to that point, I want to follow up on Judge Collins' question. Has HHS taken a position on the mixing and matching question? I believe so, because the reason that they've taken a position... It ought to be really clear. Have they taken a really clear position, or you just think that the better reading of their manuals and their guidelines is that you can't mix and match? Their manuals instruct that a hospital or regional office is supposed to subtract. And in that instruction, they're supposed to subtract the nonconforming miles. Right, nonconforming miles. When they are making that instruction and they're talking about mountainous terrain, they are not saying, you know, subtract whatever miles are not mountainous terrain unless they're secondary roads. They don't say that at all. And you could... You could also interpret it to mean you subtract nonqualifying miles. Except that it doesn't say that. It doesn't say that. And it does give an example. It gives numbers. If HHS came back and said, we think that you can mix and match, would that be a violation of Chevron Step 1? Would this court have to overrule HHS if it took that position in a regulation or a manual? Is the statute so clear that we would be required to overrule them? I mean, I believe so. I believe the statute is so very clear because just the use of the word or. If Congress wanted and or. If we disagreed with you on that point, if we thought that it was ambiguous and that HHS could take the position, and HHS, and if we thought that HHS hasn't yet taken an absolutely clear position, then does that do anything for the scienter here? If the hospital is looking at this and if the hospital had a conversation and says, you know, I'm not sure we've really got 15 miles of mountainous terrain and I'm not sure we've got 15 miles of secondary roads, but we have 15 miles if you can add them together. Consulted outside counsel, outside counsel says, I'm not sure what the right answer on this one is. You can take your risk. Does that go to the question of scienter? No. You know why? Because they don't have the miles. They don't have any miles of mountainous terrain. Under the definition, they don't have any miles of mountainous terrain. So really the only definition they can look to is secondary roads. I have a question from Judge Moskowitz. What facts would you allege if you could file a fourth amended complaint in this case? Well, I would allege the fact of the 2002 concept report for State Road 18 because that makes it very clear that there was never a designation by Caltrans that any portion of Highway 18 was mountainous terrain. And so by the time you have the June 2017 concept report, you now have a different definition, something that tightened the definition for mountainous terrain. And now what CMS is requiring is a letter from Caltrans. And they're doing that to be careful, to make sure that the application of whatever exception is actually correctly applied. And so that's what I would allege. I would include the 2002 concept report. And is that the only thing that you would add to a fourth amended complaint? Well, I don't know that that is the only thing that I would add. I mean, I think that we allege sufficient facts showing scienture. And I also think that we allege sufficient facts showing materiality. Do you have anything that you would add to a fourth amended complaint on either of those points, though? Standing right here, I cannot think of anything else. What do you have to prove in order to prove materiality? To prove? Yeah. Well, what we have to prove is that the government is taking a signal change, that the government actually considers this to be an important matter in order for it to make its payment decision, so that the government cares about this in order to make its payment decision. Did the regional office certify the rural designation, the CAH? Yes. But it's our contention that the rural office needs to do that every year. Basically, it relies on the hospitals. It relies on people, to be honest, to tell them exactly how the roads work in that particular area. But if they're certifying, what are they certifying? They're certifying that somebody checked the box? Is that what they're certifying? We believe so. We believe they're certifying that. We believe that they're certifying if there is a statement about here's the address, here's how you get to our hospital, and you check that. How material can this be, then, if the regional office is certifying this, but they're willing to do it just based on sort of, you know, if you're in the ballpark, we know that Lake Arrowhead's up in the mountains, so it's got to be a long way because. . . Well, we don't believe that that's how they are certifying it. We believe that the way that they're certifying it is if they are given a certain route, if they are looking at Google Maps, for example, and the Google Maps would take you up Highway 18 until you get to Highway 173. And if you look at it that way, they might look at that and accept that whatever representation the hospital makes. In order to determine whether or not you actually meet the exception, you have to go up there and drive those streets. You have to see what they say. And the OIG conceded that when it talked about, when it did its study, and it said that the data set that they were using couldn't tell them exactly whether or not certain roads qualified as secondary roads, for example. And that was one of the problems that they had. Did the OIG report list this hospital as one that was noncompliant? It did not. Do we know whether the OIG looked at the data for this hospital? It doesn't look that they did. But what the OIG report does say in the very beginning is it says that it couldn't determine which roads were secondary, and so it basically decided that any state road would be considered secondary just for the purposes of their analysis, which was to discuss necessary providers. If the court does not have any questions, I'd like to reserve the rest of my time for rebuttal. Thank you. Thank you, Your Honors. Chris Clinton-Michael on behalf of San Bernardino Community Hospital District. So I think a really good place to start is you just heard from Relators Council that the critical access hospitals in this program are giving the regional office certain routes to evaluate, certain addresses, that there's a reliance on the critical access hospital. Well, that's not the regulatory scheme at all, and I think that's critical for every aspect of this case. Relators Council cannot point to anything on that. In fact, if you look at the excerpts of record and you look at some of the guidance that has been issued on this, you have the critical access recertification checklist for evaluation by the regional office, and that's at 2 excerpt of record 148. And so there's a checklist there where the regional office is directed to drive the road, to consult Google Maps, to look at the routes, to go obtain a letter if they think that there's a problem with the distance requirements. And this happens both at the regional office on the initial certification and on recertifications. So what we don't have here is anything like a False Claims Act case that has any cognizable right to be in front of this court. Mountains doesn't make the determination as to whether it meets the location requirements, the distance requirements. CMS's regional office makes that determination. Mountains doesn't. But they make that determination based on representations you submit to them, don't they? Well, Your Honor, what representations were submitted that Relator has pointed out? But, no, in the actual representations, the actual submission, the hospitals merely submit their documents, give their location, and that's it. Is the question 105 on that form CMS 2552-10, does this hospital qualify as a critical access hospital CA, is that the only place that they have to sort of certify and check the box? Correct. There's no subcategory that says, are you either 35 miles from another hospital or 15 miles by mountainous or secondary roads? No, Your Honor, it does not ask, do you qualify as a critical access hospital because you yourself have told a route? And so then what does the regional office do with this self-certification? The regional office has nothing to do with the cost report. These cost reports come into effect. But what is the regional office supposed to do? I don't have the ER site that you gave me, which was, I think, Volume 2, page 148. Yes, Your Honor. That's some kind of a form that the regional office is supposed to review? Correct, correct. So regional offices review the critical access hospitals when they initially apply for enrollment. And under that form, which was issued in 2015, it's actually quite clear that the regional office goes through. And before they do anything, before they do the certifications, like the joint commission certification surveys, where they see if the hospital meets all the other hospital requirements, or before they check to see if the hospital truly offers 24-hour emergency care, the regional office looks at that distance. And they do that themselves. And Relator's position is that there's some type of reliance. And so if the Relator had given you that San Bernardino Mountains Community Hospital District or any of the other critical access hospitals that this very same Relator is suing, on the very same theory, with absolutely no knowledge or connection to those hospitals, there are at least four that we know of, and they're likely more under seal. But if that Relator had come forward and said, look, Mountains lied about which route the regional office should evaluate, well, I think maybe we could be here. But he didn't do that, and he can't do that, because critical access hospitals don't give a route for evaluation. This is solely a regional office determination. And Relator wants to make it into the critical access hospitals requirement to come forth and I guess hire their own road engineers, et cetera, to look at their distance every single year. So we don't have a case. Do they do that on their own, or do they do that in response to your assertion that you meet it and then they have to check it? I mean, did they just think of this on their own? CMS? Did you represent that you met this requirement? No. No, there's no such representation. At any point? At any point. Except that they qualify as a CAH. Which they do, because CMS qualified them as such. The regional office qualified them as such. They've been requalified. The general certification, it didn't break it down into all of the constituent points that go into being a qualified CAH. But there is a general representation that we qualify, and that means that they would have to have satisfied some distance criteria. Your Honor, there are also questions on that form 2552. Are you an inpatient rehab facility? Are you this? Are you that? It's really a demographic check the box, because CMS is gathering these cost reports. At some point you were not designated as a CAH, correct? Correct. At some earlier point. And then you became certified. Yes, 2002. How did it occur that you first became certified in 2002? The mountains and all other critical access hospitals, and this is not in front of this court on this record, submit an application to become a critical access hospital. And that application does not have some type of attestation related to the location, et cetera. So you apply for something for designation? There's not a representation that you meet the designation criteria? Correct, Your Honor. And under this entire regulatory scheme, it's the regional office's job to first evaluate that. Do we have the application form in the record? No, we do not. But, you know, so I'm 56. If I apply for Social Security and they give it to me because they say I'm 65, I can keep the money? That's right. I don't understand how there isn't a representation. If you ask for the certification, why isn't there an implied representation in the application that you meet the criteria? I didn't create the form, Your Honor. And keep in mind in 2002. I don't think that's responsive to Judge Collins' question. If you are filing an application, presumably you have read the qualifications, and if you are signing it and saying we're applying for this, then I think there's an implied representation that I meet the criteria. That's why I want you to get this to me. Well, Your Honor, if you believe there was an implied representation by Mountains in 2002 when they initially applied for this and CMS evaluated their application, well, at that time. I don't actually have anything in the record. You don't have the. . . Have you seen this form, this application form? No. Okay, so you actually don't know what's on that form. I've seen the general forms, Your Honor. Is it possible that there's a bunch of sub boxes that you have to check? Just make sure that if you're applying to be a CAH, there's at least 10 things you have to do and be sure you've done all of this. Your Honor, respectfully, that's not our burden here. That's the relator's burden. It's also the relator's burden to meet the high hurdles. Burden to come forward with the form. Yes. Okay. And to allege that there was some type of improper certification at that time in 2002. So a relator hasn't done that. And I'd like to point out the relator also is on their third or fourth route that should have been evaluated if the relator was the regional office for CMS. How is there C-enter in this category? When the regional office, you know, we don't know what route they evaluated. We don't provide them that route. None of the critical hospitals provide them the route to evaluate. Their guidance says that the regional office has primary responsibility for all of these matters. And as we can see, relator themselves cannot even settle on which route to evaluate. Relator also makes a lot of noise here, I would say, about, well, there's no proper mountainous terrain designation. In fact, in the record, Caltrans responds to the OIG and says, yeah, we do maintain HPMS mountainous terrain designations. I want to go back to what you said about, you know, it's their burden on the form and show the representation. I'm looking at ER 126, and it's paragraph 30 of the Third Amendment complaint. It says, after they found out about the benefits, it says, on or about May 16, 2002, the hospital applied for CAH status by making the affirmative representation that it met the distance requirement. And then it goes down further. Specifically, Mountain's CEO, James Haas, answered the following question under the heading of compliance with federal criteria in the affirmative. Quote, is your facility more than a third? And then it lists out the criteria. So how can you say that they've not alleged that in 2002, when you sought the designation, that you didn't make a representation that you met the criteria? Well, in 2002, Your Honor, the only guidance out there was mountainous terrain or secondary roads. That's not my question. My question was, how can you say, as you just said, that they did not allege in their complaint that you asserted that you met these criteria in 2002 when you applied? Doesn't what I just read to you make that very allegation? Your Honor, I believe it does make that allegation there. Okay, so you were wrong when you represented that. I may have minced my words, Your Honor, incorrectly. Yes. But, Your Honor, back to 2002 or back to today, the guidance is very clear that it's the regional office's responsibility to make these determinations. It's the regional office's that is to consult Google Maps. If there's a problem to make some type of determination to seek a letter, if they think there's ambiguity as to whether there's mountainous terrain, et cetera, it's not the hospital, Your Honor. It's not this critical access hospital, and it's not any of the other critical access hospitals that are being sued on this exact same theory right now. And we do have a real rural health care crisis in this country right now. And, frankly, critical access hospitals, mountains included, should not be having to defend against something that really has no sounding in fraud. That's what a False Claims Act action is about. And so here we don't know which route the regional office evaluated. That's not our job. It's never been our job. It's never been any critical access hospital's job. And I think when you start going through all the different elements, with everything that has occurred in the critical access hospital program, it's impossible to find materiality. It's impossible to find C Enter. Think about materiality. We have a natural experiment in materiality. In 2013, the OIG issued a report saying most critical access hospitals would not be able to re-enroll if they were recertified today. And they doubled down on the regional offices going out and surveying the hospitals, their requirements. And there's never been any allegation. There's never been anything from the regional office or from CMS saying that mountains has not met these distance requirements. Instead, we have a later second guessing the regional office. That's not the basis for the False Claims Act. Further, Your Honor, with this, again, back to materiality. What's happened? What's happened since 2013 after the OIG found widespread noncompliance? Nothing's happened, Your Honor. Now, what has happened and what has been pointed out is that CMS has demonstrated that it actually does prevent hospitals that it thinks don't meet the standards from enrolling as critical access hospitals. And those are the cases cited by a relator. That's my time. Thank you, Captain. Well, there's a few things to address. And as I do, I do have the application. And if I were to amend, I could attach that application to the complaint. And that question about whether or not you meet the distance requirement is asked, and that box is checked. And the numbers are part of that question, the miles that are required. That's in the paragraph 30 of your current amended complaint that I read. Right, yeah. But what I didn't do is attach it as an exhibit to the complaint. But that could be done. And so what I'm going to address several of the points that he makes. But what I wanted to point out is that the only way for a defendant to defeat the complaint at this stage is to make a number of factual representations, different representations, and to ask the court to accept those factual representations as true and to then make reasonable inferences based on those representations. And that is what a court cannot do. So, for example, one of the things that that defendant said is it points to the OIG report. And it says that it found widespread noncompliance. And it says that nothing happened since then. Well, there's nothing in our complaint for which the defendant can make that statement. That is an additional factual statement that he's making. There's no support for it. The OIG report, as we pointed out in the brief, talked about the necessary provider exception to the statute. So that is noncompliance. The necessary providers don't have to comply. And so what the OIG report points out is how expensive this program is and the fact that so many hospitals that wouldn't meet the requirements for this program if they had to reapply shows that perhaps this necessary provider exception is being abused. And it asks CMS to work with Congress to maybe remove that exception. Let me push you again on the question of both scienter and materiality in light of the fact that the regional office is responsible for certifying. Well, the regional office is responsible for certifying. But what defendant asks the court to infer is that there are zero statements from mountains in connection with that, that the regional office is just working silently in the background when it comes to certification. Well, you have what you've alleged, which I'm perfectly willing to accept, that is that there was an initial certification in 2002 and they applied and that there's an annual certification, but it appears to be just a very general check the box, yeah, we're still a critical access hospital. Which we submit requires a hospital in order to check that box, because there's hundreds of thousands of dollars that they get from checking that box, possibly a million, that they have to be aware of what the requirements are and have to be aware of whether or not they qualify. And one of the cases that we cite in the brief, it's the Thompson case in Texas, it talks about how... But if they understand that they've made an application and it has been reviewed by the regional office and nothing really has changed, the roads haven't changed since last year, we didn't put a superhighway in to Lake Arrowhead in the last year, then they can, in some way, they may be able to rely. I mean, I think this goes perhaps both certainly to scienter but probably also to materiality. And if there's an intermediary here on behalf of the government that is responsible for investigating and verifying these things, which has been doing this year after year after year, and there hasn't been any material change in the nature of the roads in the interim, can they rely on that? Doesn't that go to the question of scienter and perhaps to materiality? It goes to the definition. There was a different definition in 2002. There wasn't a definition, and so they checked the box, but there is a definition. There was one in November 2005, one in September 2007, and the one in April 2013. And what Mountains knows from its experience with the Seoul Community Hospital is that when the policies change, they could find themselves suddenly outside of the program. And it's their duty to be aware of the law, to look at the law, and when they are making these representations and getting a lot of money because of it, hundreds of thousands of dollars, and we multiply that by the 1,300 critical access hospitals. That is extremely expensive. How do you show scienter? What we're showing is a complete reckless, and what Relator knew because he worked there, is that they purposely avoided checking on laws, having a compliance department, making sure that they were in compliance. Maybe it would be sufficient for you to show that a general obligation to know what the law is. Right. That's one of the three ways that you could prove scienter. It's either actual knowledge. It is deliberate ignorance. It's a reckless disregard for the truth or falsity of the statement. They can't just keep checking the box and just, you know, refusing to look at it deeper because they're afraid they might find out that they don't comply. Thank you, counsel. Thank you. The case just argued to be submitted.
judges: Bybee, Moskowitz, Collins